UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Mack Industries, Ltd., et. al., | ) | |
| | ) | No. 17 B 09308 |
| | ) | (Jointly Administered) |
| Debtor. | ) | |
| _____ ) | ) | |
| | ) | |
| Ronald R. Peterson, as chapter 7 | ) | |
| trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 A 00576 |
| | ) | |
| Colony American Finance Lender | ) | |
| LLC, CAF REO-1 LLC, and Mack | ) | |
| LOC I, LLC, | ) | |
| | ) | |
| Defendant. | ) | Judge Carol A. Doyle |

MEMORANDUM OPINION

Ronald Peterson filed this adversary proceeding as the chapter 7 trustee of three debtors:

Mack Industries II LLC, Mack Industries V LLC, and Mack Industries VI LLC (collectively "the

Debtors").[1]  They are all related to the principal debtor in this group of cases - Mack Industries,

Ltd. ("Mack").  The trustee sued three defendants:  Colony American Finance Lender LLC

("Colony"), CAF REO-1 LLC ("CAF"), and Mack LOC I LLC ("LOC I").  He seeks to avoid

_____

[1]Mr. Peterson recently resigned as trustee and Ariane Holtschlag was appointed as the
new trustee in the Debtors' bankruptcy cases.  The documents at issue in this opinion were all
filed while Mr. Peterson was trustee.

1

transfers of real property from the Debtors to LOC I as fraudulent based on constructive fraud and actual fraud. He also seeks to pierce the corporate veils of CAF and LOC I to recover the value of the transfers from Colony.

The defendants moved to dismiss most of the trustee's amended complaint. That motion was granted. The trustee was granted leave to amend and he filed a second amended complaint ("SAC"). The defendants moved to dismiss most of the SAC. Their motion will be granted in part and denied in part. The claims to recover transfers from Colony in Counts 1 and 2 will be dismissed, as will the request to pierce two corporate veils in Count 3. The claims in Counts 1 and 2 to avoid and recover transfers from LOC I will not be dismissed.

I.     The Second Amended Complaint

The allegations in the trustee's amended complaint were discussed in the court's order issued March 31, 2021 (docket no. 56), which granted the defendants' motion to dismiss but left pending one fraudulent transfer claim against LOC I. The details in that order will not be repeated here but the gist of the claims in the amended complaint and the SAC is as follows.

Mack entered into a series of contracts with American Residential Leasing Company LLC. American Residential bought a large number of properties from Mack and contracted with Mack to manage the properties for it. Mack sought to renegotiate the contract with American Residential, claiming that it would not be possible to perform under the existing financial terms. During negotiations, a vice president of Mack told a vice president of American Residential that Mack would deplete its assets if the contract terms were not changed. Mack then proceeded to deplete its assets in various ways, including by transferring assets to Mack's owners and related

2

entities and by having Mack pay for goods and services performed on properties owned by related entities.

The McClellands, who owned the various Mack debtors, arranged for new financing from Colony for approximately 170 residential properties.  They created a new entity, LOC I, to own the properties.  LOC I was owned by LOC III, which was owned by James K. McClelland. Colony agreed to provide financing up to a specified amount of the value of each property and pay off previous mortgages.  Colony wanted all the properties to be held by one entity so the McClellands caused the Debtors to transfer the properties to be refinanced by Colony to LOC I. The loan agreement provided that Colony would get a lien on each property for the amount of funds advanced.  As further security for the loan, Colony also received a lien on the ownership interests in LOC I from LOC III (owned by James K. McClelland), which owned LOC I.

When LOC I defaulted on the loans, Colony foreclosed on its lien on the interests in LOC I.  Colony created CAF and designated it to become the owner of those interests.  CAF then caused LOC I to sell the properties in a series of bulk sales.  The trustee alleges that just months earlier, Colony had valued the properties at almost twice the bulk sale price.

The trustee seeks to avoid the transfers of the properties from the Debtors to LOC I as fraudulent.  He contends the properties transferred to LOC I had approximately $12 million in equity - their value beyond the mortgages on each property that Colony paid off.   He also seeks to pierce two corporate veils - of LOC I to get to CAF and of CAF to get to Colony - to recover from Colony the value of the transfers from the Debtors to LOC I that he seeks to avoid.

Like the amended complaint, the SAC contains three counts.  Count 1 alleges a claim to avoid and recover the transfers of the real property as constructively fraudulent under §§

544(b)(1), 548(a)(1)(B), and 550(a) of the Bankruptcy Code and provisions of the Illinois

Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(2), 6(a) and 8(a).  The claim is brought

against LOC I and Colony.  The trustee seeks to recover the value of the alleged equity in the

properties transferred from the Debtors to LOC I.

Count 2 alleges a claim to avoid and recover the transfers of the real property as actually

fraudulent under §§ 544(b)(1), 548(a)(1)(A), and 550(a) of the Bankruptcy Code and provisions

of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1) and 8(a).  This claim is

also brought against LOC I and Colony.  The trustee again seeks to recover the value of the

alleged equity in the properties transferred from the Debtors to LOC I.

Count 3 seeks to pierce the corporate veils of LOC I and CAF to recover from Colony the

value of the transfers of the real property he seeks to avoid in Counts 1 and 2.

The defendants move to dismiss the SAC on the same grounds raised in their motion to

dismiss the amended complaint.  They contend:  (1) the trustee has failed to state a claim in

Counts 1 and 2 that he can recover against Colony under § 550(a)(1) of the Bankruptcy Code

because Colony was neither the initial transferee nor a party for whose benefit the transfers were

made; (2) the trustee failed to allege an actual fraud claim in Count 2 with particularity, and

specifically the trustee failed to connect the fraudulent scheme he alleged to the transfers he seeks

to avoid; and (3) the trustee failed to allege facts that would justify piercing the corporate veils of

LOC I and CAF.  The defendants are correct on their arguments regarding § 550(a)(1) and the

request to pierce the corporate veils.  But the trustee has now alleged enough to state a claim

against LOC I in Count 2 to avoid transfers based on actual fraud.

4

II.      Section 550(a)

The trustee brings the fraudulent transfer claims in Counts 1 and 2 to avoid the transfers

of real property from the Debtors to LOC I and recover the value of the alleged "equity" in the

properties from both Colony and LOC I.  Colony argues that the trustee fails to state a claim that

he can recover against it under § 550(a)(1) of the Bankruptcy Code, 11 U.S.C. § 550(a)(1).

Section 550(a)(1) allows the trustee to bring into the bankruptcy estate the value of property

transferred when the transfer is avoided under §§ 548 and 544, the two provisions under which

the trustee seeks to avoid the transfers in this case.  The trustee must fit his claims against the

defendants into one of the categories in § 550(a) or there is no point in "avoiding" the transfers

under §§ 544(b) or 548(a) because they could not be recovered into the bankruptcy estate.  *See*

*Lassman v. Patts (In re Patts)*, 470 B.R. 234, 242 (Bankr. D. Mass. 2012) ("A successful

avoidance under § 544 will nullify a transfer, but it will not give a trustee control over the

asset."); *see also Southmark Corp. v. Schulte, Roth & Zabel, L.L.P.*, 242 B.R. 330, 337 (N.D.

Tex. 1999) (§ 550 provides an avenue of recovery for the trustee who prevails under an

avoidance section of the Code); *Santee v. Northwest Nat'l Bank (In re Mako, Inc.)*, 127 B.R. 471,

473 (Bankr. E.D. Okl. 1991) (same); *Hassett v. Zimmerman (In re O.P.M. Leasing Services,*

*Inc.)*, 32 B.R. 199, 202 (Bankr. S.D.N.Y. 1983) (same).

Section 550 provides (in relevant part):

(a)      [T]o the extent that a transfer is avoided under section 544, . . . 548, . . . of this
         title, the trustee may recover, for the benefit of the estate, the property transferred .
         . . from –
         (1) the initial transferee of such transfer or the entity for whose benefit such
         transfer was made; or
         (2) any immediate or mediate transferee of such initial transferee.

(b)    The trustee may not recover under section (a)(2) of this section from –
(1)  a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a), (b).

A.    Initial Transferee

As explained in the March 31 Order, an "initial transferee" for purposes of § 550(a)(1) is the first entity that has "dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)*; see also CLC Creditors' Grantor Trust v. Howard Savings Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 742 (Bankr. N.D. Ill. 2008) (the initial transferee is the first entity to have dominion over the asset); *Peterson v. Hofmann (In re Delta Phones, Inc.)*, No. 05-ap-1205, 2005 WL 3542667, at *3 (Bankr. N.D. Ill. Dec. 23, 2005) (same). The court determined in the March 31 Order that the first entity to have dominion over the real property transferred from the Debtors to LOC I was LOC I, not Colony. Until LOC I obtained title to the properties, it could not convey any interest in the properties to Colony. The court rejected the trustee's argument that Colony was the initial transferee because the different components of the loan transactions were conducted "as simultaneously as possible."   That analysis will not be repeated here.

*-Boyer*

The trustee makes the same argument he made in response to the first motion to dismiss – that Colony was an initial transferee under § 550(a)(1). This time he asserts that the transactions

6

should be "collapsed" under *Boyer v. Crown Stock Distrib. Inc.*, 587 F.3d 787 (7th Cir. 2009). *Boyer*, which involved a leveraged buyout, does not apply here.

In *Boyer*, the Seventh Circuit considered whether a corporation's sale of its assets that resulted in a large dividend payment to the shareholders of the corporation should be characterized as a leveraged buyout and the transactions "collapsed." The court explained that in a conventional LBO, an investor buys stock of a corporation from the shareholders with the proceeds of a loan secured by the corporation's own assets. 587 F.3d at 792. It further explained: "Some LBOs are legitimate; others are fraudulent conveyances." *Id*. If the corporation's assets are still fully secured when the corporation files for bankruptcy, the unsecured creditors will receive nothing from a sale of the corporation's assets in bankruptcy. In that circumstance, the payment to the shareholders may be deemed a fraudulent conveyance because the transaction under which they were paid provided no value to the corporation; instead it pushed the corporation to the "brink of insolvency." *Id*.

The *Boyer* court held that the transactions in that case should be characterized as a leveraged buyout and the transfers to shareholders avoided as fraudulent. It noted the sale of assets can be considered an LBO. It explained that although the purchase was nominally of the assets of the selling corporation, it distributed all the money from the sale to the shareholders and the corporation then ceased to function. The purchasing company, though technically a different corporation, operated under the same name as its predecessor and its creditors had no idea that the sale had taken place. In these circumstances, the court "collapsed" the transactions - the sale of assets of the corporation with the payment of cash "dividends" to the shareholders - and treated them as part of the same LBO deal that could be avoided as a fraudulent transfer.

Through the sale, the corporation became encumbered with over $3 million in bank debt - almost three quarters of its value- and it owed the selling corporation an additional $2.9 million to be paid over time.  The shareholders received approximately $3.6 million in cash as a result of the sale plus the $2.9 million note owed to their corporation.  The court concluded that the deal was highly likely to plunge the company into bankruptcy and that the shareholders did not give reasonably equivalent value for the cash and note they received.  The shareholders were therefore required to pay the cash they received in the form of dividends from the sale of assets to the bankruptcy estate.

The *Boyer* court never expressly stated that the shareholders were liable as initial transferees under § 550(a)(1), probably because it did not matter.  The court noted that § 550(b)(2) provides a defense to recovery by a trustee to "any immediate or mediate good faith transferee" of the initial transferee who takes for value in good faith.  The court held that the shareholders were not protected by this defense, which is not available to initial transferees, because they gave insufficient "value" in the transfer. *Id.* at 796.  Thus, the shareholders had to pay the trustee whether they were considered initial transferees or subsequent transferees.

This case bears no resemblance to the leveraged buyout in *Boye*r.  Here, Colony and LOC I entered into an arms-length lending relationship in which Colony advanced funds for the properties owned by LOC I and received liens from LOC I in the amount of the funds advanced for each property to secure the debt.  As the trustee alleges, LOC I entered into a revolving loan agreement with Colony for up to $30 million.  SAC ¶ 103.  The purpose of the loan was to acquire and renovate real estate.  Colony would advance the lesser of 75% of the value of each parcel that LOC I acquired or 85% of the cost of the property and its expected renovation.  SAC ¶

104. The loan was to be secured by the real estate that LOC I acquired. SAC ¶ 105. To further secure LOC I's loan, LOC III pledged its membership interests in LOC I. SAC ¶ 106. The Debtors transferred the properties in question to LOC I so they could be used as collateral for the loan. SAC ¶¶ 108-09. After the Debtors transferred the properties to LOC I, Colony advanced the funds, paid off previous mortgages, and received mortgages on the properties from LOC I.[2] SAC ¶ 115. As discussed in the March 31 Order, under these facts alleged by the trustee, LOC I was the initial transferee of title to the properties transferred from the Debtors. LOC I alone took title to properties. After LOC I received title, it transferred only liens to Colony in the amount of the loan funds received from Colony for each property. Colony never received title to any of the properties - not when the loans were made or at any time in the future.[3]

The trustee nonetheless argues that Colony should be considered an initial transferee of the properties under § 550(a)(1) with LOC I. He states that the transactions in this case should be "collapsed" under *Boyer* because Colony could simply have loaned money directly to the Debtors. He argues that Colony wanted the McClellands to transfer the properties to LOC I to ensure that no other creditor could seize the properties (though he never explains why any other creditor *could* seize the property ahead of the first lien holder). He contends that, "just as in *Boyer*, the whole structure of these transactions ensured that Colony got all the benefit. In the event of default, Colony would recover everything – both its real estate collateral and any further equity that existed in LOC I's property – leaving the Transferring Debtors' creditors and LOC I's

---

[2]Colony argues that this description is not accurate but the court must treat the facts alleged as true for purposes of a motion to dismiss.

[3]The properties were ultimately sold by LOC I, which retained title until the sales were completed.

other creditors in the lurch." He then contends that the "economic substance" of the transaction was that the Debtors transferred the equity in the properties to LOC I "*and* Colony." Trustee's Response at p. 3-4. This is not correct.

The trustee ignores the key distinction between this case and *Boyer:* there was never a transfer of title to Colony that could be "collapsed" with the transfer of title from the Debtors to LOC I. The trustee fails to explain how the *Boyer* court's collapsing of two sets of transfers that actually occurred applies here. The *Boyer* court considered the sale of the assets by the old corporation to the purchaser and a transfer of cash from the old corporation to shareholders of the old corporation to be part of the same LBO transaction. The court then applied fraudulent transfer law to the entire combined transaction and determined that the shareholders did not give reasonably equivalent value for the cash and note they received. Here, Colony never took title to the property so there was no transaction in which title (and therefore any equity) was transferred to Colony that could potentially be "collapsed" with the transfer of title from the Debtors to LOC I. Instead, Colony took only liens in the properties in the amount of the funds advanced for each property.

The trustee thus asks this court to do something radically different from what the *Boyer* court did: conclude that Colony was an initial transferee of title to property that was not transferred to it and then determine whether Colony gave reasonably equivalent value for the property that was not transferred to it. It is important to note that the trustee does not ask the court to avoid the transfer of the liens LOC I gave to Colony, presumably because Colony gave reasonably equivalent value as a matter of law for the liens it received (as noted in the March 31 Order). Instead, the trustee asks the court to treat Colony as the initial transferee of each property

10

that the Debtors transferred to LOC I as though Colony had received title with or instead of LOC I merely because Colony ultimately received a lien after title was transferred to LOC I. Nothing in *Boyer* supports such a conclusion. The *Boyer* court looked at the "substance" of the transaction as shareholders receiving a payout for the sale of the company, over the "form" of the payout as a mere "dividend" to shareholders. But there was an actual transfer of cash and a note to shareholders that could be avoided. Not so here. There was no transfer of title to Colony that could be considered part of a larger transaction so the "substance" over "form" analogy does not work.

The trustee attempts to avoid this obvious problem with his reliance on *Boyer* by adding new allegations to the SAC contending that Colony "insisted" that the Debtors transfer the properties on which it would loan funds to a separate corporation to protect whatever equity they may have had from other creditors.[4] He never explains, however, how these facts turn Colony into an initial transferee under § 550(a)(1). Assuming that Colony required that the properties be placed in a separate corporation (LOC I) before it would make the loans, this does not transform Colony into the recipient of title to the properties and therefore an initial transferee under § 550(a). Colony could not assert dominion and control over the properties and do with them as it pleased after the transfers from the Debtors to LOC I. Only LOC I could do that. Colony was not an initial transferee of the properties under § 550(a).

---

[4]The trustee alleges that "[i]f the McClellands had not set up LOC I and then caused the Transferring Debtors to transfer their real estate to LOC I to serve as Colony's collateral, then Colony would not have advanced funds to LOC I or any other McClelland-owned entity." SAC ¶ 102. The trustee repeats this idea in SAC ¶ 109 – "[i]f Colony was not using the properties as collateral, then the Transferring Debtors would not have transferred them."

It is important to note that although the trustee states repeatedly that the Debtors transferred the "equity" in the properties to LOC I and that he seeks to recover the value of that "equity," the "equity" in property is not a transferrable interest. The term "equity" means the value of property above the amount of liens on the property. It cannot be transferred independently of title to the property. So the Debtors did not transfer the equity in the properties to LOC I. They transferred title to the properties that allegedly had value beyond the amount of the liens on the properties. The only transfers by the Debtors that could potentially be avoided were transfers of title to the properties, regardless of whether there was equity in the properties. Colony received neither title nor the equity in the properties when the Debtors transferred them to LOC I.[5]

It is also worth noting that this case is far different from *Boyer* because the trustee's own allegations establish that Colony gave dollar-for-dollar value to LOC I in exchange for the only property interest it received – liens. Colony paid off existing mortgages that the Debtors placed on the properties and advanced additional funds to LOC I in exchange for the liens it received. There was no such *quid pro quo* in *Boyer*. The shareholders extracted $3.6 million in cash from the sale transaction plus a note for $2.9 million but transferred assets worth far less than they received.

---

[5]The trustee alleges that Colony also received a lien on the LLC interests of LOC I as part of the loan transaction. SAC ¶ 106. He does not seek to avoid the transfer of that lien, presumably because it was made by LOC III, which was owned by James K. McClelland. LOC III and McClelland have not filed for bankruptcy. The trustee therefore cannot avoid transfer of the lien on the interests in LOC I under §§ 544 or 548, which permit a trustee to avoid only a transfer of an interest of a *debtor* in property.

The *Boyer* court recognized that fraudulent transfer law protects creditors from transactions that impair creditors' rights "while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length will not be second-guessed." 587 F.3d at 793 (citation omitted).  Here, Colony engaged in a typical, arm's length real estate loan transaction in which it transferred loan funds in exchange for a promise to pay and obtained secured liens on the properties on which it loaned funds.  This is the type of transaction that the *Boyer* court said should not be "second-guessed."  *Boyer* does not support treating Colony as an initial transferee of title to (and therefore any equity in) the properties under § 550(a)(1).

### -Transfers Made "As Simultaneously as Possible"

The trustee makes another argument rejected in the March 31 Order – that the transfer of title from the Debtors to LOC I should be considered the same transaction as the subsequent transfer of liens to Colony because they occurred "as simultaneously as possible."  The court rejects these arguments for the reasons stated in the March 31 Order (pp. 5 - 6).  LOC I was the initial transferee that obtained dominion and control over the properties.  Only after LOC I took title could it transfer liens to Colony, which was a subsequent transferee of the liens.  The trustee's new allegations add nothing to support his argument.  He alleges that the properties were transferred for the "express purpose" of serving as collateral for Colony's loan and that none of the component steps of the transactions would have happened without the other.  These and similar allegations do not change the reality that title first had to be transferred to LOC I, which then had sole dominion and control over the properties, before LOC I could then transfer

13

liens to Colony.  Neither the transfer of title from the Debtors to LOC I nor the subsequent transfer of liens from LOC I to Colony gave Colony dominion or control of the properties, i.e., the right to do what it chose with the properties.

This "simultaneous" argument also fails for the reasons explained above regarding *Boyer*. It is really just another way of asking the court to "collapse" the transactions and it has the same fatal flaw as the trustee's argument under *Boyer*.  There is no transaction under which Colony received title to consider as "simultaneous" with the transfer of title from the Debtors to LOC I. So treating the transfers from the debtors to LOC I as "simultaneous" with the transfers of liens from LOC I to Colony does not transform Colony into the initial transferee of title to the properties.  Colony would still be only the recipient of liens – the only property interest it acquired – not title to the properties.

### -*Bonded*

The trustee next argues in the alternative that Colony should be considered the initial transferee of the properties "because that is what the parties intended."  Trustee Response, p. 4. He cites *Bonded Financial Services Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir. 1988), in which a bank was treated as a financial intermediary on a check made payable to the bank that it applied to a debtor's account in accordance with specific instructions received with the check.  The trustee then merely states that "[b]ecause the parties intended the properties to become Colony's collateral, Colony was the initial transferee under *Bonded*."  Trustee Response, p. 4.  The trustee provides no basis for making the logical leap from properties being transferred to LOC I to serve as collateral to Colony being treated as the initial transferee of title to those

14

properties. The trustee's argument is rejected as undeveloped and unsupported. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). Here there was no financial intermediary bound under the UCC to follow a customer's instructions, the properties were never in fact transferred to Colony, and Colony did not get dominion and control over the properties when they were transferred to LOC I. *Bonded* lends no support to the trustee's argument that Colony was the initial transferee of properties merely because the Debtors transferred them to LOC I for the purposes of granting a security interest in them to Colony.

The trustee cannot recover from Colony as an initial transferee under § 550(a)(1) of property that was never transferred to it and over which it could not exercise dominion or control as a result of the transfer.[6]

B.    Benefitting Entity under § 550(a)(1)

The Trustee next repeats his argument from the first motion to dismiss that Colony was a "benefitting entity" under § 550(a). Section 550(a)(1) permits a trustee to recover from an initial transferee or "the entity for whose benefit the transfer was made." 11 U.S.C. § 550(a)(1). The trustee relies again on decisions from the Eleventh Circuit. *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors* (*In re TOUSA, Inc.*), 680 F.3d 1298 (11th Cir. 2012); *Am. Bank of Martin Co. v. Leasing Service Corp.* (*In re Air Conditioning, Inc. of Stuart*), 845 F.2d 293 (11th Cir. 1988). This court rejected that argument in the March 31 Order, and relied on

---

[6]The trustee also states that LOC I "can also be considered a conduit for Colony." Trustee Response, p. 4. He cites no authority for this argument. It is rejected as unsupported, undeveloped, and bordering on frivolous. *See Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014).

15

Seventh Circuit cases to conclude that a subsequent transferee like Colony cannot be the entity for whose benefit the initial transfer was made. March 31 Order, pp. 6-7 (citing *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988) and *Bodenstein v. Univ. of Northern Iowa* (*In re Peregrine Fin. Group, Inc.*), 589 B.R. 360, 380-81 (Bankr. N.D. Ill. 2018)).

The trustee now relies on *Boyer* to attempt to bolster his argument that Colony should be treated as a "benefitting entity" under §550(a)(1). He contends that *Boyer* was decided 21 years after *Bonded* and did not require "rigid adherence to the labels the parties give to a transaction" but instead looked at "the economic substance of the transaction." Trustee's Response at p. 5. This is not persuasive. As noted above, the *Boyer* court did not directly address the term "initial transferee." It concluded that the shareholders in that case could not rely on a defense available only to immediate and mediate transferees under § 550(b), so it did not matter whether they were characterized as initial transferees or as immediate or mediate transferees. The shareholders were liable either way. The court never addressed the concept of "an entity for whose benefit a transfer was made" at all because the shareholders were the direct recipients of cash. The case provides no support for the trustee's argument, which is really that *Boyer* somehow nullified the holding of *Bonded* and that the court should not carefully analyze whether a defendant is an initial transferee, a person for whose benefit a transfer was made, or a subsequent transferee under §550(a). The *Bonded* court held that the structure of § 550(a) dictates that a subsequent transferee cannot be an entity for whose benefit the initial transfer was made. 838 F.2d at 895. The court explained that Congress separated initial transferees and those who benefitted from a transfer - who are treated the same way and deprived of an important defense - from immediate and mediate transferees. "The implication is that the "entity for whose benefit" is different from

a transferee, 'immediate' or otherwise." *Id*.  The court then described the categories of

"transferee" and "entity for whose benefit such transfer was made" as "mutually exclusive." *Id.*

at 896.  The trustee seeks to eliminate these distinctions and have the court conclude that Colony

was both an initial transferee of the "equity" in the properties as well as a subsequent transferee

of liens from LOC I.  Nothing in *Boyer* supports the trustee's attempt to blur the lines between

the categories in § 550(a).  And, as explained above, the "collapsing" of transactions in *Boyer* has

no relevance in this case in any event.

The trustee also argues that Colony is an entity for whose benefit the transfer was made

because it "benefitted" from the transfer.  He argues that Colony "required" that properties be

transferred to LOC I before it would advance funds on them so none of the Debtors' other alleged

creditors could benefit from the equity in the properties.  He cites no authority for concluding

that an entity that was granted a lien after property was transferred from a debtor to another party

should also be considered an entity for whose benefit the transfer of the property was made.  As

discussed in the March 31 Order, LOC I had to hold title to properties before it could convey a

security interest in them to Colony.  This does not make the transfers of title from the Debtors to

LOC I "for the benefit" of Colony for purposes of § 550(a)(1).  The *Bonded* court explained that

a transferee should be treated as a "benefitting entity" if it received essentially what the initial

transferee got.  This is what justifies treating the benefitting entity "the same way as the initial

recipients are treated" - meaning they cannot assert the "value in good faith" defense available to

immediate and mediate transferees.  *Bonded*, 838 F.2d at 896.[7]  For example, a guarantor is

---

[7]The consequence of treating Colony as a "benefitting entity" under § 550(a)(1) is that it could not assert the "value in good faith" defense available under § 550(b)(1) only to subsequent transferees (mediate and immediate transferees)*,* not to initial transferees or benefitting entities.

17

treated as an entity for whose benefit the transfer was made because it received a direct benefit -

a dollar-for-dollar reduction in its liability - from payoff of the debt but it did not receive the

money. *Id*. at 895. Here, Colony received nothing from the transfer of properties from the

Debtors to LOC I, whether it "required" the transfers as a condition to lending to LOC I or not.

Colony did not acquire the right to control the property, nor did its liabilities decrease (like a

guarantor's) as a result of the transfer of title from the Debtors to LOC I. Thus, unlike a

guarantor who receives a direct benefit from a transfer that pays the debt guaranteed, Colony

received no direct benefit from the transfers of title from the Debtors to LOC I that warrants

treating Colony as a benefitting entity under § 550(a)(1) who cannot assert the "value and good

faith" defense provided in § 550(b).

Colony is not an entity for whose benefit the transfers of title to the properties from the

Debtors to LOC I were made for purposes of § 550(a)(1).


C.      Subsequent Transferee

The trustee argues in the alternative that if Colony is not an initial transferee or a

"benefitting entity" under § 550(a)(1), then Colony is a subsequent transferee under § 550(a)(2).

He fails to explain, however, how Colony could possibly be a "subsequent transferee" of title to

(and therefore the equity in) the properties. The trustee made this argument even more briefly in

his response to the first motion to dismiss and it was rejected because the trustee had not alleged

any basis for liability under § 550(a)(2). March 31 Order, p. 7. He still has not. He cites to two

paragraphs (¶¶ 115, 143)  in the SAC that are identical to paragraphs in the amended complaint

and add nothing to his original argument. Title to the properties was *never* transferred to Colony.

18

Under the trustee's own allegations, title remained with LOC I, and the properties were sold by LOC I to a third party purchaser.  SAC ¶¶ 144 - 145.  The trustee has not alleged any other basis for recovering the transfers from Colony as a subsequent transferee under § 550(a)(2).  The court rejects the trustee's unsupported argument that Colony must be considered at least a subsequent transferee of the equity in the properties one way or the other when he has not articulated any basis in the SAC or his response brief that supports this conclusion.  *See. e.g., Rajala v. Spencer Fane LLP (In re Generation Resources Holding Co.)*, 964 F.3d 958, 967 (10th Cir. 2020) (granting defendants' motion to dismiss because the defendants could not be subsequent transferees when they never received the contract rights transferred; receiving proceeds of those rights did not make them subsequent transferees under § 550); *Lassman v. Santosuosso, Cameron & Mittleman LLP (In re Ruthaford)*, No. 11-ap-1340, 2015 WL 1510566, at *12 (Bankr. D. Mass. Mar. 30, 2015) ("Section 550(a) does not extend the right of recovery to the proceeds of the property transferred.")

It is unclear whether the trustee is now suggesting in his response for the first time that he seeks to avoid the transfers of liens from LOC I to Colony.  If so, he has failed to allege any facts that support such a claim.  A plaintiff seeking to avoid a fraudulent transfer based on constructive fraud under must plead: (1) a transfer of the debtor's property or interest; (2) made within two years before the date the bankruptcy petition was filed; (3) for which the debtor received less than a reasonably equivalent value in return; and (4) that the debtor (a) was insolvent on the date of the transfer or became insolvent as a result, (b) engaged in business or a transaction as a result of which the debtor's remaining capital was unreasonably small, or (c) intended to incur, or should have known he would incur, debts he would be unable to pay.  *KHI Liquidation Trust v.*

19

*C. Goshy Enterprises, Inc. (In re Kimball Hill, Inc.)*, No. 10-ap-998, 2012 WL 5880657, at *5 (Bankr. N.D. Ill. Nov. 19, 2012); *Cox v. Grube (In re Grube)*, No. 09-ap-8111, 2012 WL 3263905, at *4 (Bankr. C.D. Ill. Aug. 9, 2012); *Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425, 440 (Bankr. N.D. Ill. 1995).  "Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *E.E.O.C. v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007).  Plaintiffs must provide "specific facts to ground those legal claims . . . ." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

The trustee never states in the SAC that he seeks to avoid the transfer of the liens as fraudulent.  His prayers for relief in Counts 1 and 2 seek recovery of approximately $12 million - what he claims was the "equity" in the properties at the time of the transfers from the Debtors to LOC I, not the value of the liens granted to Colony.  And he fails to allege any facts that would support a claim to avoid the transfer of the liens to Colony based on actual or constructive fraud.  As noted in the March 31 Order, p. 8, note 3, it appears that he cannot allege in compliance with Rule 11 that Colony did not give reasonably equivalent value for the liens when it gave funds on a dollar-for-dollar basis for the liens it received.  This is "value" as a matter of law for the liens.  11 U.S.C. § 548(d)(2)(A).  The trustee has failed to allege a claim to avoid the liens transferred by LOC I to Colony.

The only transfers of interests in the properties to Colony were liens, which the trustee has not attempted to avoid for the reasons noted.  His claims in Counts 1 and 2 to recover from Colony the value of the properties transferred from the Debtors to LOC I must therefore be dismissed.

20

The defendants have not disputed that LOC I was the initial transferee of the transferred properties for purposes of § 550(a)(1) so the trustee's claims in Counts 1 and 2 against LOC I will not be dismissed on this basis.

III.    Actual Fraud Claim - Failure to State Claim with Particularity

The defendants also seek to dismiss Count 2 on the basis that the trustee failed to state a claim for actual fraud with the particularity required by Rule 9(b).  As with Count 1, the trustee brings this claim against two defendants:  LOC I and Colony.  The defendants argue  that even if the trustee stated a plausible basis for actual fraud regarding Mack's alleged scheme to defraud American Residential, he has failed to connect any such scheme to the transfers in this case from the Debtors to LOC I.  The trustee's new allegations in the SAC, however, are enough to get him over the Rule 9(b) hurdle for this claim.

A.     Standards for Actual Fraud Claim

To prevail on a fraudulent transfer claim based on actual fraud, a party must prove that an interest of the debtor in property was transferred by the debtor with actual intent to hinder, delay, or defraud a creditor. 11 U.S.C. § 548(a)(1)(A); *Geltzer v. Barish (In re Starr)*, 502 B.R. 760, 766 (Bankr. S.D.N.Y. 2013); *Brandt v. KLC Financial, Inc. (In re Equipment Acquisition Resources, Inc.)*, 481 B.R. 422, 427 (Bankr. N.D. Ill. 2012).[8]  To plead the claim with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, a party must

---

[8]The elements of an actual fraud claim under the Illinois Uniform Fraudulent Transfer Act are the same as those under § 548(a)(1)(A). 740 ILCS 160/5; *Equipment Acquisition Resources*, 481 B.R. at 427, n.2.

specifically identify the transfers, including the property conveyed, the date of the transfers, and any consideration paid for the transfer, and plead facts that show actual intent to defraud.  *Starr*, 502 B.R. at 769; 11 U.S.C. § 548(a)(1)(A).  The plaintiff must plead the requisite intent with respect to each transfer and must connect the allegations against the defendants to the scheme to defraud creditors.  *Equipment Acquisition Resources*, 481 B.R. at 431-32.

Actual intent to defraud can be proved by circumstantial evidence, often referred to as badges of fraud. *See, e.g., Equipment Acquisition Resources*, 481 B.R. at 430-31.  As explained in *Frierdich v Mottaz*, "[d]irect proof of actual intent to defraud is not required—indeed, it would be hard to come by—and a trustee can prove actual intent by circumstantial evidence."  294 F.3d 864, 869-70 (7th Cir. 2002).  These "badges" include:  whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.  *Id*.  A single badge of fraud is insufficient to establish intent but the presence of several may create a presumption that the debtor acted with the requisite intent to defraud.  *Id*.


B.      Factual Connection Between Scheme Alleged and Transfers

In the March 31 Order, the court concluded that the trustee failed to allege any factual link between Mack's alleged scheme to defraud American Residential, a creditor of Mack, and

the transfers by the Debtors to LOC I that he seeks to avoid in this case. There were no allegations that any assets had been transferred from Mack to the Debtors or that any of the properties transferred were purchased with funds received from Mack. Nothing connected the alleged fraud against a creditor of Mack to the transfers the trustee sought to avoid here.

The SAC contains at least some allegations that Mack transferred assets to the Debtors, though not the properties that were later transferred to LOC I. SAC ¶¶ 55, 57. The trustee alleges that Mack transferred a number of specific properties to the Debtors. SAC ¶¶ 155 - 157. He does not dispute the defendants' assertion that none of those properties was then transferred to LOC I. He contends nevertheless that the transfers from Mack to the Debtors creates a factual connection between the overall scheme of the McClellands to deplete Mack's assets to the transfers to LOC I he seeks to avoid. He essentially argues that the McClellands were moving as many assets as possible as far away from Mack as they could and the transfers he seeks to avoid in this case were part of that effort. The factual link he alleges is not compelling but it is enough to survive a motion to dismiss.

The defendants also contend that there are not enough details alleged to state an actual fraud claim with particularity in any event. They argue that the trustee has not sufficiently alleged "badges" of fraud that provide circumstantial evidence of intent to defraud. The court disagrees. The trustee has alleged that the transfers were to an entity owned (indirectly) by an insider (LOC I was owned by LOC III, which was owned by James K. McClelland). SAC ¶¶ 53, 99. He also alleges the transfers were for less than "reasonably equivalent value" because the value received by the Debtors was the payoff of existing mortgage liens but the properties were worth approximately 30% more than the liens on them. While many of the trustee's allegations

23

and arguments in support of his actual fraud claim are not persuasive and are not sufficient to allege actual fraud with particularity, in the context of the overall scheme to defraud alleged against the McClellands, he has alleged just enough to state a claim for actual fraud with particularity.

The defendants next contend that the trustee has failed to identify a creditor of the Debtors on whose behalf he could sue under § 544(b), which allows him to take advantage of the longer 4-year limitations period that applies to fraudulent transfer claims under Illinois law. The defendants are correct that the trustee has failed to identify any direct creditor of the debtors who could serve as a "predicate creditor" for the trustee's claims under § 544(b). The court concluded in the March 31 Order that American Residential could not serve as the predicate creditor when the trustee failed to allege that any of Mack's assets had been transferred to the Debtors. The trustee has now alleged that Mack transferred some assets to the Debtors, though not the properties that were then transferred to LOC I. The trustee has also identified other creditors that he argues could serve as the "predicate creditor" but they, too, were direct creditors only of Mack, not the Debtors. SAC ¶ 153. The parties have not briefed the question of whether a creditor of Mack who might have a claim for fraudulent transfer against the Debtors based on Mack's transfer of some assets to the Debtors could serve as the predicate creditor for the trustee's attempt to avoid the transfers of properties that were not transferred from Mack to the Debtors. The court therefore will not dismiss the claim for failure to identify a viable predicate creditor but preserves this issue as one to be decided in the future.

The defendants then argue that even if the trustee has identified plausible predicate creditors, he has not alleged that the Debtors were specifically trying to defraud those creditors.

The defendants cite no authority for this argument.  The trustee need not allege that the

fraudulent scheme was aimed specifically at a particular creditor under § 548.  Under §

548(a)(1)(A), the "intent 'to hinder, delay, or defraud' creditors need not target any particular

entity or individual as long as the intent is generally directed toward present or future creditors of

the debtor." *Weisfelner v. Blavatnik* (*In re Lyondell Chemical Co.)*, 567 B.R. 55, 117 (Bankr.

S.D.N.Y. 2017); *Christian Bros. H.S. Endowment v. Bayou No Leverage Fund LLC (In re Bayou*

*Group, LLC)*, 439 B.R. 284, 304 (S.D.N.Y. 2010) (both cases citing 5 Collier on Bankruptcy ¶

548.04 [1]).  "Put another way, the debtor must have had an intent to interfere with creditors'

normal collection processes or with other affiliated creditor rights for personal or malign ends."

*Lyondell Chemical* , 567 B.R. at 117.  *See also Barber v. Prod. Credit Services of West Central*

*Ill. (In re KZK Livestock, Inc.)*, 221 B.R. 471, 481 (Bankr. C..D. Ill. 1998) (under § 548(A)(1),

the intent to defraud may be directed toward existing or future creditors.)   The defendants have

cited no authority for their argument at all and so no authority holding that the analysis is

different under § 544(b).  Their argument is rejected.

The claim against LOC I in Count 2 based on actual fraud will not be dismissed for

failure to state a claim.


IV.      Count 3 - Piercing the Corporate Veil

The defendants argue that Count 3 should be dismissed because the trustee fails to allege

facts that would justify piercing two corporate veils - of LOC I and CAF - to collect from Colony

any judgment obtained against LOC I under Counts 1 and 2.  The trustee has added allegations to

the SAC but they are not enough to allege a basis for piercing the corporate veils of LOC I and CAF.[9]

The law of the state of incorporation applies to attempts to pierce a corporation's veil. *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 660 (Bankr. N.D. Ill. 2017). The defendants are Delaware limited liability companies. The parties agree that Delaware law applies to this issue.

"Under Delaware law, courts 'will disregard the corporate form only in the exceptional case.'" *Eagle Air Transport, Inc. v. National Aerotech Aviation Delaware, Inc.*, 75 F. Supp. 3d 883, 896 (N.D. Ill. 2014) (St. Eve., J) (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, Civil No. 3088, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008) (unpublished)). To state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, is a sham entity and exists for *no purpose other than to defraud* investors and creditors. *Id.* (citing *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 496 (Del. 2003)); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch.1999) ("the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.")

The particularity requirement of Rule 9(b) applies to veil piercing allegations that are based on fraud. *Eagle Air*, 75 F.Supp.3d at 896, n. 8 (N.D. Ill. 2014) (plaintiffs must plead an element of fraud to pierce the corporate veil under Delaware law). Even if there were no fraud element in Delaware's veil piercing law, "courts within this district have applied Rule 9(b)'s

---

[9]Piercing the corporate veil is an equitable remedy, not a free-standing cause of action. *In re Gulf States Long Term Acute Care of Covington, LLC*, 487 B.R. 713, 722 (Bankr. E.D.La. 2013) (gathering cases). To pursue it, however, the party seeking to pierce the veil must allege facts that would justify granting the relief sought. *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 140 (Bankr. S.D.N.Y. 2009).

particularity requirement to pleadings in which the court is asked "to pierce the corporate veil to establish liability for a claim of fraud." *Superkite PTY Limited v. Glickman*, No. 12–cv–7754, 2014 WL 1202577, at *3 (N.D. Ill. March 21, 2014) (citing *RehabCare Group East, Inc. v. Sak Mgmt. Servs.*, No. 09-cv-4523, 2010 U.S. Dist. LEXIS 85234 (N.D. Ill. Aug. 18, 2010) and *New Freedom Mortgage Corp. v. C & R Mortgage Corp.*, No. 03-cv-3027, 2004 WL 783206, at *8 (N.D. Ill. Jan. 15, 2004)).  Here, both underlying claims against LOC I in Counts 1 and 2 are for fraud.  The trustee must therefore plead facts with particularity to support piercing the corporate veil.

"Courts consider the following factors:  (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; or (5) whether, in general, the company simply functioned as a facade for the controlling shareholder." *Eagle Air*, 75 F. Supp. 3d at 896.  Delaware courts also require an element of fraud to pierce the corporate veil. *Eagle Air*, 75 F. Supp. 3d at 896*; Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. 2005); *Wallace*, 752 A.2d at 1184.

"A parent corporation is not liable for the acts of its subsidiary merely because it owns (and votes) a majority of the subsidiary's stock or shares common shareholders, directors or officers with the subsidiary.  Nor will conclusory allegations that the parent's management exclusively dominated and controlled the subsidiary's management suffice to state a claim for veil-piercing." *Wenske v. Blue Bell Creameries, Inc.*, C.A. No. 17-0699, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018).  In *Wenske*, the court dismissed a complaint as falling "short of the factual predicate required to justify piercing the veil" with allegations that (1) the parent

company was 100% owner of the subsidiary and, in that capacity, appointed all of the subsidiary's directors; (2) the parent and subsidiary have overlapping officers and directors; and (3) the parent manages the subsidiary. Merely sharing corporate officers is not sufficient. *Swiss Reinsurance America Corp. v. Access General Agency, Inc.*, 571 F. Supp. 2d 882, 885 (N.D. Ill. 2008). Insolvency alone is also insufficient. As the *Mason* court noted, if mere insolvency were sufficient to pierce the corporate veil, "the limited liability characteristic of the corporate form would be meaningless." 2005 WL 1653954, at *3.

The trustee contends that Delaware law does not require proof of actual fraud to pierce the corporate veil; it merely requires "an overall element of injustice or unfairness," citing *NetJets Aviation, Inc. V. LHC Communications LLC,* 537 F.3d 168, 176 (2nd Cir. 2008). He suggests that he need merely plead some sort of inequity to pierce the corporate veil and that selling collateral for less than he alleges was its "market" value is enough to meet this lesser standard. This is not correct.

Various courts have enunciated the test for piercing under Delaware law in different ways. Many, including those cited above, state that the entity must be designed and/or used to defraud investors and creditors. The trustee is correct, however, that other courts have held that circumstances other than actual fraud can also justify piercing. The *NetJets* court held that while the plaintiff need not prove actual fraud, there must be a "mingling of the operations" of the entities and its owner plus "an overall element of injustice or unfairness." The *NetJets* court cited *Harco Nat'l Ins. Co v. Green Farms,* No. Civ. 1131, 1989 WL 110537 (Del Ch. Apr. 18, 1989) for this proposition. The *Harco* court explained that the corporate veil may be pierced for grounds other than fraud. It stated: "In *Pauley*, the Supreme Court of Delaware stated that the

28

corporate veil may be pierced 'in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation require it, are involved.' *Pauley,* Del. Supr., 239 A.2d at 633." *Id.* at 1038.  The trustee must therefore allege fraud or other "injustice" that meets this standard.   In *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968), the court determined that the separate existence of a wholly owned subsidiary created to fulfill a mineral exploration contract served a "most legitimate business purpose" and with "no showing whatsoever . . . of fraud or other elements which would authorize the disregard of the separate corporate entities . . .," the corporate veil would not be pierced.  Here, the trustee has not pleaded specific facts to show that there was no legitimate business purpose to the existence of either CAF or LOC I or any other circumstance, such as contravention of law or contract, public wrong, or violation of rights of others members of the LLC, that would justify piercing the corporate veil under any standard applied by Delaware courts.

The March 31 Order included a detailed analysis of why the trustee's conclusory allegations in the amended complaint were not sufficient to state a basis for piercing the corporate veil under Delaware law.  That analysis applies to all the trustee's arguments that he previously made in response to the first motion to dismiss.  As explained in the March 31 Order, the amended complaint did not allege any facts about CAF other than it was created to hold the membership interests of LOC I and was owned and controlled by Colony.  This was not enough under Delaware law.  It also alleged generally that LOC I had no independent existence and was controlled by Colony through CAF.  Again, not enough under Delaware law.  There were no allegations about undercapitalization or corporate formalities.  Most importantly, there were no

facts to support the crucial element - that LOC I and CAF were shams used solely to commit fraud or the type of injustice that would justify piercing the corporate veil.

In the SAC, the trustee alleged some new facts but they are not sufficient to support the remedy of piercing the corporate veil.  The trustee now alleges that "Colony structured these transactions [so that] no one else . . . could seize the assets . . . ."  SAC ¶ 101.  He alleged no specific facts to support the conclusion that the transactions were structured to accomplish a fraudulent or unjust purpose, or that it was in any way unusual.  As explained in the March 31 Order, there is nothing inherently fraudulent or even suspect in creating a corporate entity like LOC I to hold properties that will serve as collateral under one loan agreement with a lender, or creating a corporate entity like CAF to liquidate properties that were collateral under the same loan agreement.

The trustee next alleges that "Colony disregarded the existence of CAF and controlled LOC I directly."  SAC ¶ 190.  This allegation tracks an element of the standard for veil piercing but the trustee alleges no facts to support it.  The trustee further alleges that, on information and belief, "Colony created CAF for the purpose of holding the membership interests in LOC I after Colony acquired them" and that CAF existed for no purpose other than liquidating Colony's collateral. SAC ¶¶ 191-94.  The trustee also states that despite CAF's "nominal" ownership of LOC I, CAF did not take any independent actions.  "Instead, it was a mere instrumentality of Colony and acted only through its sole member, Colony."  SAC ¶ 193.  These may be facts but, as noted above, they are not enough under Delaware law to pierce the corporate veil.

The trustee also alleges repeatedly that the bulk sales of the properties held by LOC I prevented LOC I's other creditors, allegedly including the transferring Debtors themselves, from

recovering from the value of the properties for themselves.  SAC ¶¶ 138, 139, 199, 200.  The

trustee also added allegations stating that, by the time Colony caused LOC I to sell the properties,

Colony was aware of the McClellands' fraud from inspecting various properties.  He states that

"shortly" before Colony acquired the interest in LOC I, it obtained access to and began

inspections of properties.  Based on those inspections and other investigation, "Colony

discovered that LOC I, then directed by the McClellands, had improperly requested and obtained

advances [from Colony] for renovation work that was never or only partially completed, and that

the McClellands had submitted false sworn contractor's statements.  SAC ¶ 149.[10]  The trustee

alleges that CAF and Colony nonetheless caused LOC I to sell the properties to "hoard" the

assets for itself and it made no effort to attempt to pay other creditors of LOC I.  As in the

amended complaint, the trustee uses pejorative words like "hoard" and "siphon" but he alleges no

facts suggesting the bulk sales did not comply with applicable non-bankruptcy law or deprived

other creditors of any rights they had to the properties.

The court stated in the March 31 Order that the trustee failed to explain why CAF and

LOC I were not entitled to liquidate the properties, why the bulk sales conducted did not comply

with applicable law, or why Colony was not entitled to payment in full from the collateral before

---

[10]The trustee also refers to letters attached to his response that were not the subject of any allegation in the complaint to suggest that Colony knew that the transfers from the Debtors to LOC I could potentially be subject to attack as fraudulent.  The court cannot consider these letters on a motion to dismiss but they would not impact the analysis in any event.  American Residential sent LOC I a letter in May 2017 stating that Mack may have conveyed some real property to one or more of the "Mack LOC" entities.  It advised that American Residential deemed these properties as "potentially subject to the authority of the chapter 11 trustee."  Counsel for Colony responded by saying none of the properties held by LOC I came from Mack, that the properties were subject to valid Colony mortgages that were unaffected by the Mack bankruptcy, and that it intended to exercise its rights in the properties.  This correspondence adds nothing relevant to the analysis in this case.

any other creditor was entitled to anything. After being given leave to amend and another opportunity to provide a basis for considering the sale of collateral by a first lien holder as evidence of fraud or injustice to LOC I's other creditors, the trustee failed to do so. He has provided no basis for concluding that any other creditor's rights came ahead of Colony's rights as first lien holder.[11] He has also failed to identify any non-bankruptcy law that the bulk sale did not comply with. There is no factual or legal basis for concluding that the sales perpetrated a fraud or injustice on other creditors that could potentially justify piercing the corporate veil.

The trustee also added allegations that LOC I could have sold each property individually through separate market sales that would have generated much more money than the bulk sales it made to a single buyer. SAC ¶ 197. He states that the properties could have sold for more than twice the amount received through the bulk sale if they were "properly" marketed individually. In fact, he alleges that such individual sales would have yielded a "surplus" on each property. These allegations, however, are not of fact. They are mere speculation by the trustee as to what an individual sale of each property might have yielded. Even if treated as factual allegations about what would have happened in the future, they are not sufficient to support the inference of fraud or similar injustice. Again, the trustee has failed to provide any legal basis for concluding that LOC I was required to sell the properties individually to potentially get more money over a longer and more complicated process. By failing to provide any legal basis for concluding otherwise, and particularly after the court discussed this issue in the March 31 Order, the trustee effectively concedes that the bulk sales were proper under applicable law. The trustee's new

---

[11]The trustee has never identified any direct creditor of LOC I. He only identifies parties who were creditors of Mack who had potential fraudulent transfer claims against the Debtors.

allegations that LOC I and CAF failed to sell the properties in longer and more complex

individual sales are not sufficient to support the conclusion that CAF or Colony operated LOC I

solely to defraud LOC I's other creditors.  Though he contends that Colony caused LOC I to

"rush" to sales that resulted in the properties being sold for half their alleged "market" value, the

principal party harmed by this supposed rush was Colony itself.[12]  The trustee has failed to

provide any legal or factual basis for concluding that the sale of the properties was not a proper

exercise of a secured creditor's right to liquidate the collateral.

The trustee seeks to pierce two corporate veils because CAF caused LOC I to sell the

properties in bulk sales and received less than the values that Colony had previously given the

properties and than they supposedly could have gotten if they sold each of over 170 properties

separately.  The facts alleged are not enough to establish fraud or similar injustice that could

justify piercing the veils of the two corporations.  The trustee has therefore failed to allege facts

that satisfy the requirements of either Rule 9(b) or Rule 8(a) for a request to pierce the corporate

veil.  The trustee's request to pierce the corporate veils of LOC I and CAF in Count 3 will be

dismissed.

---

[12]The trustee's own allegations suggest some reasons that the properties may have sold
for less than  the value Colony previously gave them.  The trustee alleges that the McClellands
defrauded Colony in various ways, including by submitting false statements to Colony to obtain
funds for renovation work on LOC I's properties that was never or only partially completed and
submitting false sworn contractors' statements.  SAC ¶¶ 93, 149.  They also  removed building
materials, supplies, fixtures and other goods and personal property from LOC I's properties. SAC
¶ 150.

V.      Conclusion

The defendants' motion to dismiss the SAC will be granted in part and denied in part.

The claims in Counts 1 and 2 against Colony will be dismissed.  The claims in Counts 1 and 2

against LOC I remain.  The attempt to pierce the corporate veils of LOC I and CAF in Count 3

will be dismissed.


Dated: December 21, 2021                        ENTERED:


                                                _____
                                                Carol A. Doyle
                                                United States Bankruptcy Judge